**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 15-cr-00149-RM

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**RAUL CARAVEO,**

    Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT RAUL CARAVEO's MOTION FOR COMPASSIONATE – IMMEDIATE RELEASE**

The Defendant's Motion for Compassionate-Immediate Release, ECF No. 600 — as liberally construed by the government — asks for release from confinement pursuant to amendments to the First Step Act codified at 18 U.S.C. § 3582(c)(1)(A) on grounds of a need to "care for his elderly parents" and to avoid contracting COVID-19.  As set forth in more detail below, the Court should deny the motion on the ground that it lacks jurisdiction.  In the alternative, the motion should be denied because the defendant's motion does not present reasons that are "extraordinary and compelling" as the law construes that phrase.

**I.  FACTUAL BACKGROUND:  THE DEFENDANT'S STATE AND FEDERAL CONVICTIONS**

The defendant has an extensive and violent criminal history featuring the use of firearms to terrorize and attack others.  In his early twenties, he was convicted of second degree assault after use of a firearm to cause someone serious bodily injury.  Just three days before he pleaded guilty to that offense — undeterred by the prospect of a felony conviction — he was arrested for

1

felony menacing with a firearm.  Later, after being charged in a spree of crimes that included robbery and kidnapping he was found not guilty by reason of insanity and remanded for treatment at the Colorado Mental Health Institute.  There, his criminal behavior evolved and became more sophisticated:  the defendant concocted a scheme to defraud the government by filing false tax returns in which he and co-conspirators claimed to be dependents of one another.  In 2007 he pleaded guilty in Pubelo County case No. 07-cr-399, to four counts of possessing forged instruments and was sentenced to 3 years on each count, to be served consecutively (the "State Fraud Sentence").

While serving the State Fraud Sentence, the defendant continued his scheme.  This led to federal charges that resulted in the conviction and sentence from which he now seeks relief.  As set forth in his plea agreement, Doc. No. 193, the defendant worked with co-conspirators in and outside of prison to file additional false tax returns claiming refunds in the names of other prisons based on the Earned Income Tax Credit.  Between May 2008 and May 2014, the conspirators filed 259 returns seeking $701,045.  Ultimately, their efforts yielded 138 refund checks worth a total of $370,384.28.  The consequences of the defendant's crime were not entirely financial.  The defendant also used his charm and charisma to corrupt and recruit co-conspirators, including Cristina Portillos, who was convicted by a jury in May 2016.

The Court sentenced the defendant to seventy months' imprisonment on November 19, 2015.  Notably, that judgment runs *consecutive* to the State Fraud Sentence. ECF No. 285.  A detainer from the State of Colorado, attached here as Exhibit 1, remains lodged against the defendant.[1]

---

[1] The existence of the detainer does not preclude the Court from independently granting

## II. THE COURT HAS NO JURISDICTION TO CONSIDER THE DEFENDANT'S MOTION

As other judges in this district have noted, U.S. District Courts lack jurisdiction to consider compassionate release claims until they have been considered by the entity in the best position to evaluate them: the Bureau of Prisons ("BOP"). *See United States v. Soto*, 16-cr-00138-CMA, ECF No. 99 (D. Colo. April 15, 2020); *United States v. Campanella*, 18-cr-00328-PAB-12, ECF No. 500 (D. Colo. April 14, 2020). The defendant does not claim to have exhausted any administrative remedies available to him and the government, after consulting with the BOP, has learned that BOP has not received the defendant's request for release.

While the government is mindful of the concerns created by COVID-19, it is also committed to acting fairly, efficiently, and after careful consideration informed by expertise. Acting in this manner requires enforcement of the compassionate release statute's requirement that requests for such release be presented first to the Bureau of Prisons for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the Bureau's failure to move on the defendant's behalf, may a defendant move for compassionate release in court.

### A. The Plain Terms of The Compassionate Release Statute and Principles of Finality Require Dismissal of the Defendant's Motion on Jurisdictional Grounds

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—

---

relief under federal law. However, ordering the defendant's release from federal custody would require his transfer into state custody while the pandemic is active in Colorado and, as a result, may actually *increase* rather than decrease the risk of contagion to the defendant and to those who would have the duty of transporting him.

> (1) in any case—
>
>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A). The requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. The Third Circuit recently confirmed: where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization. *See, e.g., United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks

omitted).

Consistent with that principle of finality, Section 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," 18 U.S.C. § 3582(c), except in three circumstances: (1) upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A), such as that presented by the defendant; (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); and (3) where the defendant was sentenced "based on" a retroactively lowered sentencing range, 18 U.S.C. § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for compassionate release—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties*," Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting Eberhart v. United States, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. See *United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that Section 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for compassionate release where the defendant has failed to satisfy the exhaustion requirement of Section 3582(c)(1)(A).

While the government maintains that the time limitation in Section 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of Section 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.

It is well settled that a court may not ignore a statutory command such as that presented in Section 3582(c)(1)(A).  The Supreme Court recently reaffirmed this principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 (PLRA). That Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856. The Court stated:

> No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. *See McKart v. United States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* at 1857.

That rule plainly applies to the statutory text here. Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

### B.       The Cases Cited by the Defendant Are Inconsistent with Supreme Court Precedent

Some have suggested that the exhaustion requirement of Section 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. However, there is no "futility" exception, as the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement. Thus, in *United States v. Perez*, -- F. Supp. 3d --, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) — cited in the defendant's motion — the court incorrectly excused exhaustion of a claim based on COVID-19 as "futile," relying solely on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which addressed only a judicially created exhaustion requirement.  And in any event, a request in this context is not futile, because, as explained further below, BOP fully considers requests for compassionate release. Indeed, BOP often concurs with such requests. During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

The other cases cited by the defendant are no more instructive.  The Court's opinion in *United States v. Muniz*, 4:09-cr-0199, ECF No. 578 (S.D. Tex. March 30, 2020) cites to three newspaper articles but no judicial precedent, including the Supreme Court cases described above. The order in *United States v. Brannan*, 4:15-cr-80-01, ECF No. 286 (S.D. Tex. April 2, 2020) likewise contains no citations to precedent and was issued without an opportunity for the government to respond.

The requirement of a 30-day period to afford BOP the initial review of the defendant's request cannot be excused. While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial

8

resort to administrative remedies. And this is for good reason: The Bureau of Prisons conducts an extensive assessment for such requests. See 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the Bureau of Prisons completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

This remains true in the present crisis. The government does not underplay the defendant's concerns in any way. This Court, like all citizens, is vividly aware that COVID-19 is a nefarious illness, which has infected large numbers of people and caused many deaths in a short period of time. BOP has accordingly taken significant measures in an effort to protect the health of the inmates in its charge. BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO). On March 13, 2010, BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following: all incoming inmates are screened, and staff are regularly screened; contractor visits are limited to essential services, while nearly all attorney, social, and volunteer visits have been suspended; inmate movements between facilities have been extremely limited; and institutions

9

are taking additional steps to modify operations to maximize social distancing. BOP has taken further steps as events require, including confining all inmates to their living quarters for a 14-day period beginning on April 1, 2020, in order to mitigate any spread of the disease. Many additional details are available at the BOP website, www.bop.gov.

In addition, in recent weeks, BOP has been granted wider authority to designate inmates for home confinement in its toolkit of available measures. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the solution is not to exclude BOP from reviewing applications for

compassionate release. There are many challenging factors to consider during this unprecedented pandemic, and BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider a myriad of other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced if any service), and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2. Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

Case 1:15-cr-00149-RM   Document 603   Filed 04/23/20   USDC Colorado   Page 12 of 16

## III. EVEN IF CONSIDERED ON THE MERITS, THE DEFENDANT HAS NOT SHOWN THE EXTRAORDINARY AND COMPELLING CIRCUMSTANCES REQUIRED FOR RELEASE

If the Court does conclude that it has jurisdiction, it should still deny the defendant's motion on the merits. The Court may grant the defendant's motion for reduction of sentence only "if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Further, the proposed sentencing reduction must be consistent with "the factors set forth in section 3553(a)." *Id.* In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (unpublished). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (unpublished) (citations omitted).

The defendant's ability to bring a motion for release under Section 3582 was created by the First Step Act's amendments. The statute previously allowed such a motion only by the Bureau of Prisons. Aside from allowing prisoners to bring motions directly, however, the First Step Act did not change the substantive requirements for compassionate release. As was the case before the First Step Act, the rules for allowing release appear in the Sentencing Commission's policy statements, as directed by Congress in 28 U.S.C. § 994(t). Thus, the Application Notes to U.S.S.G. § 1B1.13, "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)," define "extraordinary and compelling reasons."

There are four categories of circumstances that can be deemed extraordinary and compelling: (1) terminal or serious medical conditions that "substantially diminish" a

defendant's ability to provide self-care and from which the defendant is not expected to recover, (2) serious physical and mental deterioration suffered by defendants who are sixty-five or older and who have served at least 10 years or 75% of his sentence, (3) the death or incapacitation of a caregiver for minor children of a spouse in circumstances where the defendant is the only available caregiver, and (4) "other reasons" determined by the Director of Prisons, which are set forth in Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last accessed April 20, 2020). U.S.S.G. § 1B1.13 Application Notes 1(A) – (D).

The defendant does not identify any circumstances satisfying the first two categories. While he does assert a need to care for his parents, the law only allows for compassionate release to care for a "minor child" or "spouse or registered partner." U.S.S.G. § 1B1.13 Application Note 1(C). Even if it were broader, the defendant does not explain why his release is necessary to care for his parents or whether there are alternative caregivers.

The fourth category is more complicated. Before the First Step Act amendments, it was up to the Bureau to determine that an unenumerated factor should be considered "extraordinary and compelling." Now that a defendant can bring such a motion directly, courts are divided as to whether a court now also has the discretion to characterize something other than medical condition, age, or family circumstance as outlined in Section 1B1.13 to be "extraordinary and compelling." *See, United States v. Fox*, 2019 WL 3046086, at \*2 (D. Maine July 11, 2019) (citing cases on both sides of the divide). The Tenth Circuit has not yet addressed how, if at all, the Sentencing Commission's policy statement is affected by the expanded statute. The government's position is that in evaluating this fourth category the court is limited to the grounds

13

set forth in the BOP's regulation, Program Statement 5050.50, which is available at https://www.bop.gov/policy/progstat/5050 050 EN.pdf. *See United States v. Thorpe*, 2019 WL 6119214 at *2 (C.D. Ill. Nov. 18, 2019); (rejecting motion because, among other things, the BOP "has not delineated this as such a scenario[,]" and thus the court "would not find the standard met regardless of whether it was in the Court's discretion or the Bureau's"); *United States v. Lake*, 2019 WL 4143293 at *3-4 (E.D. Kentucky August 30, 2019) (consideration of BOP Program Statement in analysis of exercise of discretion).

The defendant bears the burden of proving the existence of extraordinary and compelling reasons under the fourth category. *Cannon v. United States*, 2019 WL 5580233 at * 2 (S.D. Ala. October 29, 2019); *United States v. Heromin*, 2019 WL 2411311 at *2 (M.D. Fla. June 7, 2019); *cf. United States v. Hamilton,* 715 F.3d 328, 337 (11th Cir. 2013) ("a defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case"). The only reason asserted for a reduction in his sentence is COVID-19. This, by itself, is not an extraordinary and compelling reason. *See* ; *Raia*, --- F.3d ---, 2020 WL 1647922, at *3 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. April 9, 2020) ("[I]n this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prison will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme.").

## **CONCLUSION**

The defendant's motion should be denied. The Court does not have jurisdiction to consider the matter before the Bureau of Prisons has had an opportunity to evaluate the defendant's suitability for release. Even if it did, the defendant has not presented a reason that is either extraordinary or compelling under the law to warrant his release.

    Respectfully submitted,

    JASON R. DUNN
    United States Attorney

By:    s/ *Bryan David Fields*
    BRYAN DAVID FIELDS
    Assistant United States Attorney
    1801 California Street, Suite 1600
    Denver, Colorado 80202
    Telephone: (303) 454-0100
    Facsimile: (303) 454-0404
    Bryan.Fields3@usdoj.gov
    Attorney for the Government

**CERTIFICATE OF SERVICE**

        I hereby certify that on this 23rd day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a record of the filing to the defendant's counsel of record.

        s/ *Bryan David Fields*
BRYAN DAVID FIELDS
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0404
Bryan.Fields3@usdoj.gov